**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

MICHELLE ALICIA S.,[1]          ) Case No. EDCV 17-2114-JPR
                                )
                Plaintiff,      )
                                ) **MEMORANDUM DECISION AND ORDER**
        v.                      ) **AFFIRMING COMMISSIONER**
                                )
NANCY A. BERRYHILL, Acting      )
Commissioner of Social          )
Security,                       )
                                )
                Defendant.      )
                                )

**I.    PROCEEDINGS**

Plaintiff seeks review of the Commissioner's final decision denying her application for supplemental security income benefits ("SSI").  The parties consented to the jurisdiction of the undersigned under 28 U.S.C. § 636(c).  The matter is before the Court on the parties' Joint Stipulation, filed October 5, 2018, which the Court has taken under submission without oral argument.

---

[1] Plaintiff's name is partially redacted in compliance with Federal Rule of Civil Procedure 5.2(c)(2)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States.

1

For the reasons stated below, the Commissioner's decision is affirmed.

**II.  BACKGROUND**

Plaintiff was born in 1962.  (Administrative Record ("AR") 38, 174.)  She completed 12th grade (AR 38, 202) and some college (AR 202, 325).  She last worked as a "caregiver or caretaker," from 2007 to 2009.  (AR 38; <u>see also</u> AR 239.)[2]

On May 16, 2014, Plaintiff applied for SSI, alleging that she had been unable to work since May 9, 2009,[3] because of "bad knees," "left shoulder . . . lump," "scarred lungs, can't breath [sic] good," "depression," "anxiety," "paranoia," and "PTSD." (AR 70; <u>see also</u> AR 174-82.)  After her application was denied initially (AR 70-85) and on reconsideration (AR 86-103), she requested a hearing before an Administrative Law Judge (AR 122). A hearing was held on July 12, 2016, at which she was represented by counsel and testified.  (AR 36-69.)  A vocational expert also testified.  (AR 62-67.)

In a written decision issued September 21, 2016, the ALJ found Plaintiff not disabled since May 16, 2014.  (<u>See</u> AR 25; <u>see also generally</u> AR 16-26.)  Plaintiff requested review from the

---

[2] The ALJ found that Plaintiff had worked briefly in 2014 and 2015 but that that work did not qualify as substantial gainful activity.  (AR 18.)

[3] At the hearing, Plaintiff's attorney amended the onset date to the date on "which she applied."  (AR 36; <u>see also</u> AR 35-36.)  The attorney referred to that date as June 9, 2014 (AR 36), which is the date listed on the SSI application summary (AR 174). But the ALJ used the May 16 date during the hearing without objection (AR 35) and reiterated in his decision that the onset date was "amended . . . to May 16, 2014" (AR 16; <u>see also, e.g.</u>, AR 70, 85).  The Court uses the earlier date.

Appeals Council (171-73), which denied it on September 25, 2017 (AR 1-4).  This action followed.

**III. STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits.  The ALJ's findings and decision should be upheld if they are free of legal error and supported by substantial evidence based on the record as a whole.  See Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007).  Substantial evidence means such evidence as a reasonable person might accept as adequate to support a conclusion.  Richardson, 402 U.S. at 401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).  It is more than a scintilla but less than a preponderance.  Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006)).  To determine whether substantial evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion."  Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998).  "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not substitute its judgment" for the Commissioner's.  Id. at 720-21.

**IV.  THE EVALUATION OF DISABILITY**

People are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or has lasted, or is expected to last, for a continuous period of at least 12 months.  42 U.S.C.

3

§ 423(d)(1)(A); <u>Drouin v. Sullivan</u>, 966 F.2d 1255, 1257 (9th Cir. 1992).

### A. The Five-Step Evaluation Process

The ALJ follows a five-step sequential evaluation process to assess whether a claimant is disabled. 20 C.F.R. § 416.920(a)(4); <u>Lester v. Chater</u>, 81 F.3d 821, 828 n.5 (9th Cir. 1995) (as amended Apr. 9, 1996). In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim must be denied. § 416.920(a)(4)(i).

If the claimant is not engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting her ability to do basic work activities; if not, the claimant is not disabled and her claim must be denied. § 416.920(a)(4)(ii).

If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments set forth at 20 C.F.R. part 404, subpart P, appendix 1; if so, disability is conclusively presumed. § 416.920(a)(4)(iii).

If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant

4

has sufficient residual functional capacity ("RFC")[4] to perform her past work; if so, she is not disabled and the claim must be denied. § 416.920(a)(4)(iv). The claimant has the burden of proving she is unable to perform past relevant work. Drouin, 966 F.2d at 1257. If the claimant meets that burden, a prima facie case of disability is established. Id.

If that happens or if the claimant has no past relevant work, the Commissioner then bears the burden of establishing that the claimant is not disabled because she can perform other substantial gainful work available in the national economy. § 416.920(a)(4)(v); Drouin, 966 F.2d at 1257. That determination comprises the fifth and final step in the sequential analysis. § 416.920(a)(4)(v); Lester, 81 F.3d at 828 n.5; Drouin, 966 F.2d at 1257.

B.   The ALJ's Application of the Five-Step Process

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the application date, May 16, 2014. (AR 18.) At step two, he determined that she had severe impairments of "arthralgias;[5] chronic obstructive pulmonary disease (COPD); and bipolar affective disorder." (Id.) He found

---

[4] RFC is what a claimant can do despite existing exertional and nonexertional limitations. § 416.945; see also Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989). The Commissioner assesses the claimant's RFC between steps three and four. Laborin v. Berryhill, 867 F.3d 1151, 1153 (9th Cir. 2017) (citing § 416.920(a)(4)).

[5] Arthralgia refers to any type of joint pain. See Arthritis vs. Arthralgia, healthline, https://www.healthline.com/health/rheumatoid-arthritis/arthralgia#distinctions (last updated Dec. 1, 2016). It is not necessarily linked to arthritis, though it can be. (Id.)

5

other ailments mentioned in the record "nonsevere," including "obesity," "benign . . . lipoma," and "history of polysubstance dependence."  (AR 19.)

At step three, he determined that Plaintiff's impairments did not meet or equal a listing.  (AR 19-21.)  At step four, he found that she had the RFC to perform "light work"

> except: can lift and carry 20 pounds occasionally and 10 pounds frequently; can stand and walk for 6 hours in an 8-hour workday; can sit for 6 hours in an 8-hour workday; can perform occasional kneeling, jumping, and walking on uneven terrain; should avoid even moderate exposure to fumes, odors, dusts, gases, and poor ventilation; is limited to work involving simple repetitive tasks; and no more than occasional contact with co-workers, and no contact with the general public.

(AR 21.)  She had no past relevant work.  (AR 24.)  At step five, he concluded that given her age, education, work experience, and RFC, and "[b]ased on the testimony of the vocational expert" (AR 25), she could perform at least one representative job in the national economy: "Assembler of small products," DOT 706.684-022, 1991 WL 679050 (Jan. 1, 2016), "an unskilled position . . . performed at a light exertional level" (AR 25).  Accordingly, he found Plaintiff not disabled.  (AR 25-26.)

**V. DISCUSSION**[6]

Plaintiff argues that the ALJ (1) "failed to properly evaluate [her] mental illness" (J. Stip. at 9), (2) "failed to give great weight to treating [p]sychiatrist Dr. Kurera" (id. at 12),[7] (3) improperly assessed her RFC (see id. at 11, 19-21), (4) "did not address the [c]ombination of her impairments" (id. at 21), and (5) "did not meet [the Commissioner's] burden of [p]roof at [s]tep [five]" (id. at 23).[8]  As discussed below, remand is

---

[6] In Lucia v. SEC, 138 S. Ct. 2044, 2055 (2018), the Supreme Court recently held that ALJs of the Securities and Exchange Commission are "Officers of the United States" and thus subject to the Appointments Clause.  To the extent Lucia applies to Social Security ALJs, Plaintiff has forfeited the issue by failing to raise it during her administrative proceedings.  (See AR 36-69, 171-72); Meanel v. Apfel, 172 F.3d 1111, 1115 (9th Cir. 1999) (as amended) (plaintiff forfeits issues not raised before ALJ or Appeals Council); see also generally Kabani & Co. v. SEC, 733 F. App'x 918, 919 (9th Cir. 2018) (rejecting Lucia challenge because plaintiff did not raise it during administrative proceedings); Davidson v. Comm'r of Soc. Sec., No. 2:16-cv-00102, 2018 WL 4680327 (M.D. Tenn. Sept. 28, 2018) (same).

[7] The Court extrapolates this argument into a separate issue, although Plaintiff does not present it that way.

[8] Because the ALJ's decision is affirmed, the Court does not address Plaintiff's additional argument that it should apply the credit-as-true doctrine and award her benefits.  (See J. Stip. at 26, 29.)  And as the Commissioner notes, though Plaintiff might have "intend[ed] to argue that the ALJ erred somehow in his credibility analysis," she does not "present any actual argument concerning" his analysis, "identify any errors," or "include even one citation to the record."  (Id. at 27.)  Thus, no such argument has been properly presented. See Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1161 n.2 (9th Cir. 2008) (declining to address challenge to ALJ's finding when claimant "failed to argue th[e] issue with any specificity"); see also Nazarian v. Berryhill, No. CV 17-1114 JC, 2018 WL 2938581, at *3 (C.D. Cal. June 7, 2018) (collecting cases).  Further, most of Plaintiff's claims were not presented during her administrative

(continued...)

not warranted on any of these grounds.

A. The ALJ Properly Evaluated Plaintiff's Mental Illness

Plaintiff claims that the ALJ failed to (1) "properly evaluate [her] mental illness" in accordance with the "special techniques" outlined in § 416.920a, (2) develop the record as to her psychiatric treatment in prison and after her release, and (3) consider the effect of her mental impairment on her RFC. (See J. Stip. at 9-12.) As set forth below, the ALJ did not err.

1. Applicable law

An ALJ must apply a five-step evaluation process to determine whether a claimant qualifies as disabled. See Garrison v. Colvin, 759 F.3d 995, 1010-11 (9th Cir. 2014). When evaluating an alleged mental impairment, an ALJ must follow a "special psychiatric review technique" during steps two and three. Keyser v. Comm'r of Soc. Sec. Admin., 648 F.3d 721, 725 (9th Cir. 2011) (citing § 404.1520a). The special technique for evaluating alleged mental impairments in SSI claims is codified in

---

[8] (...continued)
proceedings. (See generally AR 32-69 (hearing transcript), 171-72 (request for Appeals Council review, making vague claims about "more test[]s," upcoming shoulder surgery, and ongoing issues related to COPD).) Normally, such claims would be forfeited. See Meanel v. Apfel, 172 F.3d 1111, 1115 (9th Cir. 1999) (as amended). But because Defendant largely has not challenged her claims on that basis (see generally J. Stip. at 13-17, 20, 22, 24-25 (challenging as forfeited only argument that ALJ failed to fully develop record)), the Court proceeds to consider them. See Dexter v. Colvin, 731 F.3d 977, 979 n.3 (9th Cir. 2013); Saari v. Berryhill, 745 F. App'x 775, 776 (9th Cir. 2018).

§ 416.920a.[9] First, an ALJ must determine whether the claimant has a medically determinable mental impairment. § 416.920a(b). Next, he must "rate the degree of functional limitation resulting from the impairment(s)" in "four broad functional areas": "[a]ctivities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." § 416.920a(b)(2), (c)(3)-(4). If the degree of impairment in these areas is "none" or "mild," the impairment is "generally . . . not severe." § 416.920a(d)(1). If it is "moderate, marked, [or] extreme," it is severe, and the ALJ "must then determine if [the impairment] meets or is equivalent" to a "listed mental disorder." § 416.920a(c)(4), (d)(2). If it does not meet or equal a listing, then the ALJ will continue with the five-step evaluation process and assess the claimant's RFC. § 416.920a(d)(3). The ALJ's written decision "must incorporate the pertinent findings and conclusions based on the technique . . . [and] include a specific finding as to the degree of

---

[9] Social Security regulations regarding the evaluation of mental impairments were last amended effective March 27, 2017. When, as here, the ALJ's decision is the final decision of the Commissioner, the reviewing court generally applies the law in effect at the time of the ALJ's decision. See Lowry v. Astrue, 474 F. App'x 801, 804 n.2 (2d Cir. 2012) (applying version of regulation in effect at time of ALJ's decision despite subsequent amendment); Garrett ex rel. Moore v. Barnhart, 366 F.3d 643, 647 (8th Cir. 2004) ("We apply the rules that were in effect at the time the Commissioner's decision became final."); Spencer v. Colvin, No. 3:15-CV-05925-DWC, 2016 WL 7046848, at *9 n.4 (W.D. Wash. Dec. 1, 2016) ("42 U.S.C. § 405 does not contain any express authorization from Congress allowing the Commissioner to engage in retroactive rulemaking"). Accordingly, citations to 20 C.F.R. § 416.920a are to the version in effect from June 13, 2011, to January 16, 2017.

limitation in each of the functional areas." § 416.920a(e)(4).

In assessing a disability claim, an ALJ has a "duty to fully and fairly develop the record" and "assure that [a] claimant's interests are considered." Garcia v. Comm'r of Soc. Sec., 768 F.3d 925, 930 (9th Cir. 2014) (citation omitted); see also Howard ex rel. Wolff v. Barnhart, 341 F.3d 1006, 1012 (9th Cir. 2003) ("In making a determination of disability, the ALJ must develop the record and interpret the medical evidence."). But it nonetheless remains the claimant's burden to produce evidence in support of her disability claim. See Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001) (as amended). Moreover, the "ALJ's duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." McLeod v. Astrue, 640 F.3d 881, 885 (9th Cir. 2010) (as amended May 19, 2011) (citation omitted); accord Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th Cir. 2001).

A claimant's RFC is "the most [she] can still do" despite impairments and related symptoms that "may cause physical and mental limitations" affecting "what [she] can do in a work setting." § 416.945(a)(1). A district court must uphold an ALJ's RFC assessment when the ALJ has applied the proper legal standard and substantial evidence in the record as a whole supports the decision. Bayliss v. Barnhart, 427 F.3d 1211, 1217 (9th Cir. 2005). The ALJ should consider all the medical evidence in the record and "explain in [his] decision the weight given to . . . [the] opinions from treating sources, nontreating sources, and other nonexamining sources." § 416.945(e)(2)(ii).

"[T]he findings of a nontreating, nonexamining physician can amount to substantial evidence, so long as other evidence in the record supports those findings." Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996) (per curiam) (as amended). When a claimant alleges mental-health limitations, the ALJ should "first assess the nature and extent of [her] mental limitations and restrictions and then determine [her] residual functional capacity for work activity on a regular and continuing basis." § 416.945(c); see also § 416.945(a)(1) ("We will assess your residual functional capacity based on all the relevant evidence in your case record."); SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (RFC must be "based on all of the relevant evidence in the case record").

In making an RFC determination, the ALJ may consider the limitations supported in the record and need not consider properly rejected evidence or subjective complaints. See Bayliss, 427 F.3d at 1217 (upholding ALJ's RFC determination because "the ALJ took into account those limitations for which there was record support that did not depend on [plaintiff's] subjective complaints"); Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1197 (9th Cir. 2004) (ALJ not required to incorporate into RFC any findings from treating-physician opinions that were "permissibly discounted").

## 2. Relevant background

### a. *Mental-health treatment records*

The sole mental-health-related record from Plaintiff's time in prison[10] is a 2013 annual treatment report, which indicates that she had not received mental-health services for any serious conditions (see AR 317) and did not require an "[a]cute level of care" (id.). After her release in 2014, she was referred for mental-health services "as a condition of her . . . probation requirements." (AR 323.)

At her initial assessment, in May 2014, Plaintiff reported experiencing "extensive trauma" from "torture[]" and being "held captive" in 1982, resulting in "PTSD" and "depressive symptoms" that were "further exacerbat[ed]" by "domestic violence relationships." (Id.) She reported that lack of treatment "resulted in increased symptoms and detrimental impact on functioning." (Id.) She was apparently taking Zoloft[11] (the record doesn't indicate when it was first prescribed), and it was "[e]ffective." (AR 324.) The assessor, whose name and speciality are not legible, found her to be "[w]ell [g]roomed" and "[c]alm," with "[u]nimpaired" speech, intellectual functioning, memory, and thought processes and "[i]ntact" concentration and judgment. (AR 326.) But Plaintiff had a

---

[10] Plaintiff reported that her "[a]rrest history began in 1993" and that she had had "[five] incidences of incarceration." (AR 325.)

[11] Zoloft treats depression, panic attacks, and social anxiety disorder. See Zoloft, WebMD, https://www.webmd.com/drugs/2/drug-35-8095/zoloft-oral/sertraline-oral/details (last visited Feb. 14, 2019).

"[c]onstricted," "[b]lunted," and "[f]lat" affect, and she appeared "[a]nxious." (Id.) She was diagnosed with "[p]osttraumatic [s]tress [d]isorder" and "[d]epressive [d]isorder." (AR 327.)

On June 10, 2014, Plaintiff met with psychiatrist Heather Kurera for "initial medication support service" and "[s]upportive therapy." (AR 435-37.) She "denie[d] current feelings of depression" and anxiety but reported experiencing "[p]anic" a few times a month and often feeling like "she [was] being followed, watched." (AR 435.) She told the doctor that she had been "assigned to [a mental health] ward" in prison "because she was on meds."[12] (Id.) She "report[ed] no interest in working at this time – worrie[d] she would steal and [said] 'I can't work with the public.'" (AR 437.) Dr. Kurera observed that she had a "depressed, anxious" mood but demonstrated "linear, logical and goal directed" thought processes and "fair" insight, "with intact judgment." (AR 436.) Plaintiff's reported "paranoia" was "more of a generalized sense of not being safe and not being able to trust others . . . no other evidence of a thought [disorder.]" (AR 437.) She increased Plaintiff's Zoloft dosage "to target PTSD and depression" and prescribed trazodone[13] "for sleep." (Id.)

That same day, Dr. Kurera filled out a report to assist in

---

[12] The record does not show where Plaintiff was housed in prison.

[13] Trazodone treats depression and may decrease related insomnia. See Trazodone HCL, WebMD, https://www.webmd.com/drugs/2/drug-11188-89/trazodone-oral/trazodone-oral/details (last visited Feb. 14, 2019).

Plaintiff's transition to services in San Bernardino County, where she had evidently moved. (AR 328.) She marked that Plaintiff had a "[t]emporary disability" that would last one year, until June 10, 2015. (Id.) An "adequate trial of treatment" was needed "before determining permanence." (Id.) She could not perform any type of work in the interim. (Id.)

Plaintiff was "discharged" from her probation-mandated treatment program in June 2014 after moving to a different county. (AR 439; see also generally AR 438-41.) The discharge summary states that she "received weekly mental health services[14] [and] was very engaged and cooperative throughout her time in treatment." (AR 439.) In just over a month, she had "made moderate progress towards decreasing PTSD symptoms," and she "was stable at discharge." (AR 438, 440.)

In November 2014, Plaintiff was assessed for treatment in San Bernardino County. (AR 473-76.) After the initial intake appointment (see id.), psychiatrist Sushma Sachdev-Wali provided medication management (see AR 478-80, 482-500). Dr. Sachdev-Wali's notes, which span November 2014 to April 2015, are brief and largely illegible, but they clearly refer to several medications, including Zoloft, Abilify,[15] and Xanax.[16] (See,

_____

[14] The record does not include notes from these appointments. (See AR 442 (letter indicating that only initial medication support service and discharge summary were provided).)

[15] Abilify is an antipsychotic that treats mood disorders. See Abilify, WebMD, https://www.webmd.com/drugs/2/drug-64439/abilify-oral/details (last visited Feb. 14, 2019).

[16] Xanax treats anxiety and panic disorders. See Xanax,
(continued...)

e.g., AR 482.)[17]   In January 2015, the doctor "[re]ferred [Plaintiff] for [c]ounseling" (AR 479), but the record doesn't indicate that Plaintiff received such counseling.  At the July 2016 hearing, she testified that she was on a wait list for counseling.  (AR 48.)

### b.   *State-agency reviewing-physician records*

Psychiatrist Dan Funkenstein reviewed Plaintiff's mental-health records in July 2014 and opined that she had the ability to do nonpublic, simple, repetitive tasks (abbreviated in the record as "NP/SRT").  (AR 76, 78, 81-82.)  He found that she was "[n]ot significantly limited" in her "ability to remember locations and work-like procedures," "understand and remember very short and simple instructions," "carry out very short and simple instructions," "work in coordination with or in proximity to others without being distracted," "make simple work-related decisions," "ask simple questions," "maintain socially appropriate behavior," "take appropriate precautions," "use public transportation," or "set realistic goals or make plans independently of others."  (AR 81-82.)  But she was "moderately limited" in her "ability to understand and remember detailed instructions," "carry out detailed instructions," "maintain attention and concentration for extended periods," "perform

---

[16] (...continued)
WebMD, https://www.webmd.com/drugs/2/drug-9824/xanax-oral/details (last visited Feb. 14, 2019).

[17]   Dr. Sachdev-Wali's notes indicate that Plaintiff reported she had received inpatient psychiatric treatment in 1997 for an unspecified reason.  (AR 478.)  The AR does not contain any record of that hospitalization, however.

15

activities within a schedule," "sustain an ordinary routine
without special supervision," "complete a normal workday,"
"interact appropriately with the general public," "get along with
coworkers," and "respond appropriately to changes in the work
setting." (Id.) In support of his findings, he cited
Plaintiff's medical records and a "prior [consulting evaluation]"
that was "not severe." (See AR 76, 78, 82.) On reconsideration,
psychiatrist H. Amado affirmed his findings. (See AR 93, 95, 98-
100.)

   3. <u>Analysis</u>

    a. *Mental-impairment evaluation*

  Plaintiff argues that the ALJ did not apply the "special
techniques," citing the evaluation process codified in
§ 416.920a. (J. Stip. at 9.) She does not develop that
argument, however, and in fact the ALJ went through each of the
required steps to evaluate her mental impairment. (<u>See generally</u>
AR 18-21.) Considering all the relevant evidence, the ALJ found
that Plaintiff had "severe" bipolar affective disorder. (AR 18.)
He noted that she had "mild restriction" in activities of daily
living and "moderate difficulties" in "social functioning" and
"concentration, persistence[, and] pace." (AR 20.) She had had
"no episodes of decompensation . . . [or] psychiatric
hospitalizations." (Id.) By rating and assessing Plaintiff's
limitations in each of the four functional areas, the ALJ met the
requirements set forth in § 416.920a. <u>See</u> <u>Hoopai v. Astrue</u>, 499
F.3d 1071, 1078 (finding that "[t]he ALJ clearly met [the
regulatory] requirement by rating and assessing [the claimant's]
limitations in each of the[] functional areas" and "was not

16

required to make any more specific findings of the claimant's functional limitations"). After concluding that her "mental impairments, considered singly and in combination," did not meet a listing (AR 19-21), he went on to assess her RFC (AR 21). As Defendant notes, "[t]he ALJ clearly applied the 'special technique' as required by the regulations," and "Plaintiff does not bring any challenge to these specific findings." (J. Stip. at 14.)[18]

Without a more specific allegation of what the ALJ allegedly did wrong, Plaintiff's claim concerning the special technique fails. See Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1161 n.2 (9th Cir. 2008).

### b. *Duty to develop the record*

Plaintiff argues that certain records are missing, including psychiatric records from the California Department of Corrections and Rehabilitation, weekly therapy records, and other unspecified treatment records. (See J. Stip. at 10, 12.) She implies that the record was thus insufficient, triggering the ALJ's duty to develop it. (See id. at 10-11.) She also contends that her "long history of mental illness" "heightened" the ALJ's duty to develop the record, citing Higbee v. Sullivan, 975 F.2d 558, 562 (9th Cir. 1992) (per curiam), even though she was represented by counsel throughout the proceedings. (See J. Stip. at 10.)

As an initial matter and as argued by Defendant (see id. at

_____

[18] In her reply, Plaintiff seems to suggest that the ALJ "base[d] his opinion on factually incorrect evidence." (J. Stip. at 19.) She does not specify which evidence was factually incorrect, and no such factual inaccuracies are apparent to the Court.

17

14-16), not only did Plaintiff fail to raise this issue during
the administrative proceedings (see generally AR 32-69 (hearing
transcript), 171-72 (request for review of ALJ decision)), but
her attorney affirmatively represented that the record was
complete (see AR 34). Accordingly, she likely waived the right
to make this claim in federal court. See Meanel v. Apfel, 172
F.3d 1111, 1115 (9th Cir. 1999) (as amended) (reviewing court
need not address issues not raised before ALJ or Appeals Council
unless manifest injustice would result); Shaibi v. Berryhill, 883
F.3d 1102, 1109 (9th Cir. 2017) (as amended Feb. 28, 2018)
(upholding and applying Meanel after Sims v. Apfel, 530 U.S. 103
(2000)); see also Phillips v. Colvin, 593 F. App'x 683, 684 (9th
Cir. 2015) ("This issue was waived by [claimant]'s failure to
raise it at the administrative level when he was represented by
counsel, and [claimant] has not demonstrated manifest injustice
excusing the failure.").

Even if Plaintiff could properly raise an argument about
missing records, it would likely fail. She, not the ALJ, was
required to produce evidence to support her disability claim.
See Mayes, 276 F.3d at 459; Meanel, 172 F.3d at 1115. The record
here included opinions from state-agency reviewing psychological
consultants and notes from Plaintiff's treating psychiatrists and
mental-health providers. (See generally AR 78-82, 95-100, 323-
28, 435-38, 473-500.) Counter to her claim, all medical records
from May 2013 to "[p]resent" were requested from the California
Department of Corrections and Rehabilitation. (See AR 320.) And
the only mental-health record provided by the CDCR indicated that

Plaintiff did not require mental-health services.[19]  (See AR 317-
18.)  Furthermore, the ALJ asked her attorney at the hearing
whether any records were missing, and the attorney confirmed that
the record was "pretty complete" and that "we have everything
. . . that's out there."  (AR 34, 67.)

Higbee recognizes that an ALJ's duty to develop the record
is heightened when a claimant is unrepresented or when she
previously was eligible for benefits based on mental illness; it
does not help Plaintiff's case.  See 975 F.2d at 561-62
(collecting cases).  Plaintiff was represented by counsel
throughout her administrative hearings and continues to be
represented.  She also has never been found eligible for benefits
based on mental illness.  (Cf. AR 35 (ALJ noting that in 2012,
another ALJ dismissed disability claim), 74-75 (stating that in
2011, consulting internist determined that she could do medium
work, consulting psychiatrist found "[n]o limitations," and claim
"was dismissed" after ALJ hearing), 194 ("Chavez . . . screening
guide" indicating previous claim was not "final" decision).)
Therefore, Higbee is not instructive.

Plaintiff is correct that the record does not include
evidence of the weekly unspecified "therapy" sessions she

---

[19] The prison records were not actually needed, in any case.
The ALJ found and Plaintiff does not contest that the alleged
onset date was May 16, 2014, which was apparently after her
release from prison.  Plaintiff asserts that she was housed in a
mental-health ward at some point while in prison (see J. Stip. at
10), but given that her incarcerations apparently spanned 20
years (see AR 325) and that her most recent prison record said
she didn't need mental-health services (see AR 317-18), that
information by itself is not helpful.

apparently attended.  (See J. Stip. at 10; see also AR 212, 225.)
But, as Defendant points out, she had the burden of producing
those records in the first place or raising the issue earlier.
See Mayes, 276 F.3d at 459; (see also J. Stip. at 14-15).   And
she still has not pointed to any additional records that the ALJ
should have considered or provided the name of the therapist she
allegedly saw every week (see generally id. at 10-11).

In any event, the ALJ properly discounted the severity of
Plaintiff's alleged mental-health limitations in part because she
did not "require extensive counseling."  (AR 23.)   Even if
Plaintiff was attending weekly sessions, that was not
inconsistent with the ALJ's reasoning.   Those sessions apparently
lasted for only a month (see AR 212, 225 (function reports dated
June 2014, during month she attended Prototypes clinic,
describing weekly therapy sessions), 438-40 (discharge summary
from Prototypes clinic dated June 2014, describing one month of
treatment)), after which she was on a wait list for counseling
from her new provider (see AR 48, 479).   Moreover, as explained
in Section V.B.2, Plaintiff testified that her depression,
anxiety, and mood swings were controlled just with medication.

Thus, the ALJ did not err in not developing the record
further, but even if he did, Plaintiff waived her right to make
the claim by agreeing that the record was complete.   See Meanel,
172 F.3d at 1115.

c.   *Plaintiff's RFC*

Accounting for Plaintiff's mental limitations, the ALJ
limited her "to work involving simple repetitive tasks[,] no more
than occasional contact with co-workers, and no contact with the

20

general public." (AR 21.)  He considered Plaintiff's statements

(AR 21-22), treatment history (AR 23), and daily activities (<u>id.</u>)

as well as opinions from medical sources (AR 23-24).  Plaintiff

argues that his analysis did not address her "ability to

understand, to carry out and remember instructions, to respond

appropriately to supervision, coworkers, and customary work

pressures in a work setting" (J. Stip. at 11), but the ALJ

explicitly referred to each of these concerns in his decision

(<u>see</u> AR 20-24 (limiting her to simple, repetitive work,

occasional contact with coworkers, and no contact with public)).

    Plaintiff claims that "[c]onsultative [e]xaminer Amado, MD"

found that she had "difficulty carrying out short and simple

instructions, detailed instructions" and was unable "to maintain

attention and concentration for an extended period of time or to

sustain ordinary routine without special supervision."  (J. Stip.

at 11.)  But as Defendant notes, that "mischaracterizes" the

record.  (<u>Id.</u> at 16.)  Dr. Amado (who reviewed some of

Plaintiff's files but did not examine her) actually found that

Plaintiff was "[n]ot significantly limited" in her ability to

"understand," "remember," or "carry out very short and simple

instructions" and only "moderately limited" in her ability to do

the same for "detailed instructions."  (AR 98-99.)  And Dr. Amado

determined that she was "[m]oderately limited" in her "ability to

maintain attention and concentration for extended periods" and

"sustain an ordinary routine without special supervision" but not

unable to do so.  (AR 98.)  In any event, the ALJ addressed

Plaintiff's mental impairments by limiting her to simple,

repetitive work, occasional contact with coworkers, and no

contact with the public. (AR 21.) See Stubbs-Danielson v. Astrue, 539 F.3d 1169, 1174 (9th Cir. 2008).

Plaintiff also suggests that the ALJ failed to address limitations noted by her son (J. Stip. at 11), but again, that misstates the record. The ALJ considered the function reports filled out by Plaintiff and her son (see AR 208-29) and determined that although they "show deficits in some activities," they also "show [that she] is still able to handle her personal hygiene, . . . get out of her home, [and] . . . interact with others without difficulties or problems" (AR 23). Therefore, the ALJ properly accounted for her son's statements. See Bruce v. Astrue, 557 F.3d 1113, 1115 (9th Cir. 2009); see also Robbins, 466 F.3d at 885 ("[T]he ALJ is required to account for all lay witness testimony in the discussion of his or her findings." (citation omitted)).

B.    The ALJ Properly Assessed Dr. Kurera's Opinion

Plaintiff argues that the ALJ should have given "great weight" to Dr. Kurera's "evaluation" and claims that the "record contradicts the ALJ's finding." (J. Stip. at 12.) As explained below, the ALJ properly found that Dr. Kurera's opinion merited "little weight" (AR 24), and remand is not necessary.

1.    Applicable law

Three types of physicians may offer opinions in Social Security cases: those who directly treated the plaintiff, those who examined but did not treat the plaintiff, and those who did neither. See Lester, 81 F.3d at 830. A treating physician's opinion is generally entitled to more weight than an examining physician's, and an examining physician's opinion is generally

entitled to more weight than a nonexamining physician's. Id.; see § 416.927.[20]

The ALJ may disregard a physician's opinion regardless of whether it is contradicted. Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989); see also Carmickle, 533 F.3d at 1164. When a doctor's opinion is not contradicted by other medical-opinion evidence, however, it may be rejected only for a "clear and convincing" reason. Magallanes, 881 F.2d at 751; Carmickle, 533 F.3d at 1164 (citing Lester, 81 F.3d at 830-31). When it is contradicted, the ALJ need provide only a "specific and legitimate" reason for discounting it. Carmickle, 533 F.3d at 1164 (citing Lester, 81 F.3d at 830-31). The weight given a doctor's opinion, moreover, depends on whether it is consistent with the record and accompanied by adequate explanation, among other things. See § 416.927(c), (e); see also Orn v. Astrue, 495 F.3d 625, 631 (9th Cir. 2007) (factors in assessing physician's opinion include length of treatment relationship, frequency of examination, and nature and extent of treatment relationship).

Furthermore, "[t]he ALJ need not accept the opinion of any physician . . . if that opinion is brief, conclusory, and inadequately supported by clinical findings." Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002) (citation omitted); accord Batson, 359 F.3d at 1195; see also McLeod, 640 F.3d at 884-85 (finding that treating physician's opinion "is not binding

_____

[20] Social Security regulations regarding the evaluation of opinion evidence were amended effective March 27, 2017. See § 416.927. For the reasons stated supra in note 9, citations to § 416.927 are to the version in effect from August 24, 2012, to March 26, 2017.

on an ALJ with respect to the existence of an impairment or the
ultimate determination of disability" (citation omitted)).   An
ALJ need not recite "magic words" to reject a physician's opinion
or a portion of it; the court may draw "specific and legitimate
inferences" from the ALJ's opinion.  <u>Magallanes</u>, 881 F.2d at 755.

      2.  <u>Analysis</u>

    The ALJ gave Dr. Kurera's opinion "little weight" because it
was based on only two visits with Plaintiff,[21] did not accord
with her "conservative treatment," and was not supported by the
medical records.  (AR 24.)

    Inconsistency with the medical evidence, including a
doctor's own treatment notes, is a specific and legitimate reason
to discount a treating physician's opinion.  <u>See</u> <u>Tommasetti v.</u>
<u>Astrue</u>, 533 F.3d 1035, 1041 (9th Cir. 2008); <u>Connett v. Barnhart</u>,
340 F.3d 871, 875 (9th Cir. 2003) (physician's opinion properly
rejected when his own treatment notes "provide[d] no basis for
functional restrictions he opined should be imposed on
[plaintiff]"); <u>Rollins v. Massanari</u>, 261 F.3d 853, 856 (9th Cir.
2001) (ALJ permissibly rejected physician's opinion when it was
"implausible" and "not supported by any findings by any doctor,"
including herself).  Dr. Kurera's treatment notes did not explain
why a year-long trial period was necessary to determine permanent
disability, nor did they include evidence for temporary

--------------------------------------------------------------------

[21] In fact, Plaintiff apparently met with Dr. Kurera only
once, in June 2014.  The May 2014 initial assessment cited by the
ALJ (AR 24) was performed by someone else at the clinic (<u>see</u> AR
327 (initial assessment bearing signatures other than Dr.
Kurera's)).  Further, Dr. Kurera's one session with Plaintiff was
conducted "telementally," apparently by computer or phone.  (<u>See</u>
AR 437.)

disability.  (See AR 328, 435-37.)  At their sole appointment,
she recorded Plaintiff's self-reported history and found that she
had "linear, logical and goal-directed" thought processes; "fair"
insight; and "intact judgment."  (AR 435-37.)  Though she
observed that Plaintiff had a "depressed, anxious" mood (AR 436),
Plaintiff denied feeling depressed or anxious (AR 435).
Moreover, the initial assessment at the clinic cited by the ALJ
(AR 24), performed a few weeks before by someone other than Dr.
Kurera, found her "[n]ormal," "[u]nimpaired," or "[i]ntact" in
every way except that she had "[c]urrent lack of
pleasure/hopelessness," was "[i]solated" and "[w]ithdrawn," and
had a "[c]onstricted," "[b]lunted," and "[f]lat" affect.  (AR
326.)  She had no "thought process disturbances," and her memory
and intellectual functioning were "[u]nimpaired."  (Id.)

     Furthermore, Dr. Kurera evaluated Plaintiff only once before
opining that she would be "temporarily disabled from June 10,
2014 through June 10, 2015."  (AR 24 (citing AR 328).)  The
limited nature of her treating relationship with Plaintiff
entitled the ALJ to give her opinion less weight.  See
§ 416.927(c); see also Orn, 495 F.3d at 631.

     Shortly after Dr. Kurera provided her opinion, Plaintiff
moved and switched treatment providers.  As the ALJ noted,
"records from the new provider show the claimant only required
medication visits and minimal, if any, counseling."  (AR 24; see
also generally AR 473-500.)  Plaintiff testified that she was on
a wait list for counseling (AR 48), but she apparently was stable
on her medication regimen.  She testified that her medications
"balance[d] out" her depression, rendering it "okay . . . to

where I don't have . . . anxiety and depression." (AR 48.)
Similarly, she testified that she experienced "mood swings" only
"[i]f I miss my medicine." (AR 56.)

Plaintiff argues that her treatment was "not limited to
medication" (J. Stip. at 13), but the record shows that it was
(see generally AR 473-500 (no evidence of counseling from Nov.
2014 on)). Plaintiff also argues that "Dr. Sachdev-Wali's
evaluation is consistent with Dr. Kurera's assessment," citing
notes from the former's "initial evaluation," but that evaluation
was not done by Dr. Sachdev-Wali,[22] and it consisted primarily of
Plaintiff's self-reported symptoms, which the ALJ discounted (a
finding Plaintiff has not appealed). (See J. Stip. at 12-13; see
also AR 473-74.) Thus, the ALJ properly found that Dr. Kurera's
opinion was undermined by the medical records. (AR 24.)

Given the limited number of meetings, lack of supporting
medical evidence, and Plaintiff's subsequent and apparently
successful medication-only treatment, the ALJ appropriately gave
Dr. Kurera's opinion "little weight." (AR 24.) See Orn, 495
F.3d at 631; Thomas, 278 F.3d at 957.

C.    The ALJ Properly Determined Plaintiff's RFC

Plaintiff argues that the ALJ improperly found that she
could perform light work despite arthralgia and COPD. (J. Stip.
at 19-21.) For the reasons discussed below, the ALJ did not err
and remand is not warranted on this basis.

_____

[22] The form was completed by "Jessica Villareal," who added
the letters MAMFTI to her signature, suggesting she was not a
medical doctor. (AR 476.)

26

1                   1.   <u>Relevant background</u>

2              a.   *Arthralgia treatment records*

Routine exams showed that Plaintiff had mostly normal range of motion and muscle strength. (<u>See, e.g.</u>, AR 352 (July 2014 examination: "alignment of the major joints and spine is symmetrical"; no "signs of muscle atrophy"; "no swelling, effusions, temperature changes, tenderness or crepitus" on palpation; "no restriction or instability related to ligamentous laxity"; "[m]uscle strength testing is 5/5 in all major muscle groups"), 506 (May 2016 examination yielding similar results).) Despite her complaints of knee and back pain, x-rays done in 2014 revealed no or minimal issues. (<u>See</u> AR 357 ("knees are symmetric[,] . . . osseous structures and joint spaces are intact[,] . . . no fractures or significant arthritic changes"), 358 ("[m]inimal scoliosis and degenerative changes are noted in the spine"), 471 ("hips are symmetric[,] [n]o fractures or arthritic changes are observed").) An MRI done of her left knee, however, apparently revealed a torn meniscus. (<u>See</u> AR 412 (orthopedist notes).)[23] X-rays done in 2016 showed no changes to her right knee[24] (<u>see</u> AR 540) or spine (<u>see</u> AR 541-42).

In October 2014, Plaintiff saw orthopedist Jay Shah for concerns about her left knee. (AR 410-13.) She told him that her symptoms were "relieved by medication" like ibuprofen and

---

[23] The MRI does not appear to be in the record.

[24] The 2014 knee x-rays were bilateral. (<u>See</u> AR 357.) Plaintiff's complaints center on her left knee (<u>see, e.g.</u> AR 43), but the record doesn't include diagnostic imaging for that knee after 2014.

"exacerbated by prolonged standing and bending." (AR 410.) He found no "effusion," "excessive varus or valgus alignment," or "patellofemoral crepitus or patellar instability." (AR 411.) She had "full extension against resistance without difficulty"; the patella "track[ed] well clinically"; and the patellofemoral joint was not tender. (Id.) All clinical testing was negative except for the "McMurray's test when loading the medial compartments."[25] (Id.) "The compression/rotation test [was] positive for a meniscal tear." (Id.) Dr. Shah "[d]iscussed conservative and surgical options," and Plaintiff opted to try conservative measures first. (AR 412.) He gave her injections of lidocaine[26] and Depo Medrol,[27] which led to "improvement in symptoms," and he referred her to physical therapy. (Id.)

In May 2015, Plaintiff saw a physician's assistant and reported "lower back pain ongoing for years." (AR 511.) She said that she was going to have a "torn left meniscus . . . repaired" but that an orthopedist told her to do physical therapy first. (Id.) She was not doing physical therapy, though, because the provider she was referred to was too far away. (Id.)

[25] A McMurray test detects internal tears in the knee joint. See Diagnosing Knee Injury with a McMurray Test, verywellhealth, https://www.verywellhealth.com/mcmurray-test-2549599 (last updated June 9, 2017).

[26] Lidocaine is an anesthetic. See lidocaine injection, WebMD, https://www.medicinenet.com/lidocaine-injection/article.htm#why_is_lidocaine_injection_prescribed_to_patients? (last visited Feb. 14, 2019).

[27] Depo Medrol is an injectable form of methylprednisolone, which treats inflamation. Methylprednisolone Injection, MedlinePlus, https://medlineplus.gov/druginfo/meds/a601157.html (last updated May 15, 2016).

The physician's assistant observed that Plaintiff's gait was "normal" and her balance was "easy." (AR 512.) He also found that the range of motion in her back was "normal" but "with pain on full rotation and flexion." (Id.) She had a positive straight-leg-raise test at 30 degrees.[28] (Id.) He prescribed diclofenac.[29] (AR 513.)

In June 2015, Plaintiff apparently had a "left knee arthroscopy with partial medial meniscectomy"[30] scheduled. (AR 508; see also AR 510.) Preoperative records are in the record, but the actual procedure is not documented.[31] (See AR 508-11.) At the July 2016 hearing, Plaintiff testified that she still had knee pain (AR 43) but did not use an assistive device for walking

[28] A straight-leg-raise test checks the mechanical movement of neurological tissues and their sensitivity to stress and compression when disc herniation is suspected. See Straight Leg Raise Test, Physiopedia, https://www.physio-pedia.com/ Straight_Leg_Raise_Test (last visited Feb. 14, 2019). Pain when the leg is raised to between 30 and 70 degrees "is suggestive of lumbar disc herniation." Id.

[29] Diclofenac is an anti-inflammatory used to relieve pain and swelling caused by arthritis. See Diclofenac Sodium, WebMD, https://www.webmd.com/drugs/2/drug-4284-4049/diclofenac-oral/ diclofenac-sodium-enteric-coated-tablet-oral/details (last visited Feb. 14, 2019).

[30] Arthroscopy is a minor surgical procedure used to diagnose and treat knee problems. See Knee Arthroscopy, OrthoInfo, https://orthoinfo.aaos.org/en/treatment/ knee-arthroscopy/ (last updated Sept. 2016).

[31] The ALJ and Plaintiff's attorney noticed that the surgery report appeared to be missing, but the attorney confirmed that "[w]e have everything," and the ALJ remarked, without objection, that "even if we don't have the left knee surgery, I don't think I'm going to necessarily go out and necessarily say that we need to get it." (AR 67-68.)

(AR 57).

b.  *COPD treatment records*

Plaintiff often complained about breathing troubles (<u>see,</u>
<u>e.g.</u>, AR 44, 203), and diagnostic imaging revealed some
"scarring" and "[m]ild interstitial lung disease but no acute
infiltrates" (AR 358; <u>see also</u> AR 335).  Her examinations often
yielded normal or mild results.  (<u>See, e.g.</u>, AR 332 ("[B]reath
sounds are symmetric.  There are no wheezes or rales.  The
expiratory phase is within normal limits."), 333 ("no use of
accessory muscles for respiration"), 347 (respiration test
showing "[n]ormal" quality and rhythm), 348 ("lungs are clear to
percussion"), 452 ("mildly diminished breath sounds[,] . . .
wheeze on forced expiration[,] no rales"), 505 ("patient is
relaxed and breathes without effort"), 512 ("breathes without
effort . . . does not use the accessory muscles of respiration"),
528 (same).)

Plaintiff began seeing pulmonolgist Ahsan Qazi in September
2014.  (AR 452-63.)  At each of their appointments, she denied
chest pain and reported that her cough was "minimal occasional."
(AR 452, 454, 457, 462.)  Dr. Qazi observed "mildly diminished
breath sounds" but no other issues.  (<u>Id.</u>)  To manage her
symptoms, he prescribed combinations of inhaler medications,

including Tudorza,[32] Flovent,[33] Xopenex,[34] and Ventolin.[35] (<u>See</u> AR 453, 455, 458, 462-63.)

     c. *State-agency physicians' opinions*

 Plaintiff complained to examining internist Aida Cruz on August 19, 2014, that she "had multiple joint pains mainly from the left knee." (AR 329.) The pain was "worse with walking, standing and sitting." (<u>Id.</u>) She also had "left hip pain," "left shoulder pain," and "low back pain." (AR 329-30.)

 Dr. Cruz found that Plaintiff's back had "normal" range of motion and "no tenderness to palpation in the midline or paraspinal areas." (AR 332.) The straight-leg-raise test was negative. (<u>Id.</u>) She got on and off the examining table without difficulty. (AR 331.) Range of motion in her neck, shoulders, elbows, wrists, hips, and ankles was all "normal," and her gait

---

[32] Tudorza is an inhaler medication that controls and prevents COPD symptoms. <u>See</u> <u>Tudorza Pressair</u>, WebMD, https://www.webmd.com/drugs/2/drug-162180/tudorza-pressair-inhalation/details (last visited Feb. 14, 2019). It must be used regularly and does not provide immediate relief. <u>See</u> <u>id.</u>

[33] Flovent is another inhaler medication that controls and prevents COPD symptoms. <u>See</u> <u>Flovent Aerosol</u>, WebMD, https://www.webmd.com/drugs/2/drug-13522/flovent-inhalation/details (last visited Feb. 14, 2019). It must be used regularly and does not provide immediate relief. <u>See</u> <u>id.</u>

[34] Xopenex is an inhaler medication that provides quick relief from wheezing and shortness of breath. <u>See</u> <u>Xopenex Vial for Nebulizer</u>, WebMD, https://www.webmd.com/drugs/2/drug-17125/xopenex-inhalation/details (last visited Feb. 14, 2019).

[35] Ventolin is an inhaler medication that provides quick relief from wheezing and shortness of breath. <u>See</u> <u>Ventolin Solution for Nebulization</u>, WebMD, https://www.webmd.com/drugs/2/drug-7082-3008/ventolin-inhalation/albuterol-salbutamol-solution-inhalation/details (last visited Feb. 14, 2019).

was also "normal." (AR 331-33.) Her left knee had "limited range of motion" but no "effusion" or "mediolateral or anteroposterior instability." (AR 333.) Plaintiff's strength was "5/5 in all extremities," and she had "[g]ood tone bilaterally, with good active motion." (Id.) The doctor determined that Plaintiff could do medium work but should "avoid frequent kneeling, jumping and walking on uneven terrain due to the knee condition." (AR 334.) She did not assess any restrictions based on Plaintiff's back, hip, or shoulder complaints. (See generally id.)

As to Plaintiff's COPD, Dr. Cruz obseved that she had "symmetric" breath sounds, "no wheezes or rales," and a "normal" expiratory phase. (AR 332.) But because of her complaints and other medical records (see AR 330), she recommended that Plaintiff "avoid exposure to extreme temperatures, chemical pollutants or any pulmonary irritants" (AR 334).

State reviewing-physician Joel Ross[36] reviewed Plaintiff's records in September 2014 — before her surgery — and noted that her left knee "exhibit[ed] limited [range of motion]" but her "[g]ait and sensory and motor function were n[orma]l." (AR 76.) Despite complaints of breathing troubles, her treating records and consulting examination showed "clear breath sounds with no rales or wheezing" and "no use of accessory muscles for respiration." (Id.) He concluded that the medical evidence

---

[36] Dr. Ross's signature has a specialty code of 20, indicating a neurology practice. (AR 85); Program Operations Manual System (POMS) DI 24501.004, U.S. Soc. Sec. Admin. (May 15, 2015), https://secure.ssa.gov/apps10/poms.nsf/lnx/0424501004.

32

affirmed the consulting examiner's finding that Plaintiff could do medium work. (See AR 84; see also AR 76, 83.) On reconsideration in January 2015, state reviewing-physician G. Taylor-Holmes[37] confirmed that Plaintiff was not disabled and could do medium, unskilled work. (AR 101.)

    2. <u>Analysis</u>

    The ALJ found that Plaintiff had severe impairments of arthralgia and COPD (AR 18) but that neither met or equaled a listing (AR 19). He noted that the COPD caused "moderate obstruction" and the arthralgia limited "her capacity to lift, carry, sit, stand and walk." (AR 22.) But her medical records showed that "her motor strength [was mostly] normal," and so he determined that she was "capable of light work." (<u>Id.</u>)

    Though Plaintiff frequently complained about trouble breathing (<u>see, e.g.</u>, AR 42, 47, 203), the ALJ found that her "statements concerning the intensity, persistence and limiting effects of [her] symptoms [were] not entirely consistent with the medical evidence and other evidence in the record (AR 22), a finding Plaintiff does not contest (<u>see generally</u> J. Stip.). Indeed, the medical records show that Plaintiff's respiration was mostly normal. (<u>See, e.g.</u>, AR 332, 333, 348.) Her treatment was limited to prescriptions for inhalers, and as the ALJ noted (AR 23), she apparently never needed emergency treatment (<u>see</u> AR 330 (Plaintiff denying "episodes of respiratory failure"), 354

---

    [37] Dr. Taylor-Holmes's signature has a specialty code of 19, indicating an internal-medicine practice. (AR 103); Program Operations Manual System (POMS) DI 24501.004, U.S. Soc. Sec. Admin. (May 15, 2015), https://secure.ssa.gov/apps10/poms.nsf/lnx/0424501004.

(noting in July 2014 that Plaintiff had been using inhalers for two years and had not seen pulmonologist in that time)).  The pulmonologist whom she began seeing in September 2014 observed only "mild[]" symptoms.  (See, e.g. AR 452.)  Considering all the evidence in the record, the ALJ limited Plaintiff's RFC to protect her from moderate or concentrated exposure to certain environmental conditions that could "cause a flare-up of her [COPD] symptoms."  (AR 22.)

Contrary to Plaintiff's assertion that the ALJ failed to "address[]" her "physical limitations in isolation" (J. Stip. at 20), he also limited her RFC to allow for only occasional kneeling, jumping, or walking on uneven terrain, citing her reported knee and back pain (AR 22).  He assessed those limits even though the record, as he noted, did not support the alleged severity of her symptoms.  (AR 23.)  Treatment records and x-rays revealed "no joint degeneration" in her right knee and "only mild findings" concerning her lower back.  (Id. (citing AR 540-42); see also AR 357-58.)[38]

Plaintiff complains that Defendant's discussion of Dr. Cruz's findings that support the RFC is a "post hoc argument[]" "which the ALJ did not make."  (J. Stip. at 20-21.)  But the ALJ extensively discussed Dr. Cruz's findings.  (See, e.g., AR 22-

---

[38] Plaintiff also complains that the ALJ did not take into account Dr. Cruz's finding of limited grip strength in her left hand.  (J. Stip. at 20.)  But the doctor noted that those findings were "with poor effort."  (AR 331.)  The ALJ was not required to incorporate any hand limitation into the RFC.  See Howard ex rel. Wolff v. Barnhart, 341 F.3d 1006, 1012 (9th Cir. 2003) (ALJ need not discuss "every piece of evidence" (citation omitted)).

24.)  This argument is without merit.

Because sufficient evidence supported the ALJ's finding that Plaintiff could do modified light work, remand is not warranted. See <u>Reddick</u>, 157 F.3d at 720-21.

D.    <u>The ALJ Properly Evaluated the Combined Effects of Plaintiff's Impairments</u>

Plaintiff argues that the ALJ failed to address her impairments in combination.  (J. Stip. at 21-22, 23.)  But as Defendant points out (<u>see</u> <u>id.</u> at 22), she does not specify how he failed to do so, and her argument that "it might appear that [she] could struggle with her lack of . . . breath[] and somehow pull through[,] [b]ut in combination with her paranoia she does not have the mental strength to prevail" (<u>id.</u> at 21-22) is not supported by any medical evidence in the record.

The ALJ "considered all symptoms" when assessing Plaintiff's RFC (AR 21), noting that her "arthralgias" and "COPD" limited her to light work with reduced exposure to certain environmental conditions (AR 22).  He determined that her "alleged mood disorder" and "alleged pain symptoms and breathing problems" together caused "no more than a mild restriction in activities of daily living" and "no more than moderate difficulties with regard to concentration, persistence or pace" (AR 20), and he factored these limitations into her RFC by restricting her to "simple repetitive tasks" (AR 21; <u>see also</u> AR 22-23).  And as Defendant suggests, the ALJ "arguably . . . consider[ed] the combined effect of her impairments in limiting her to light work, when three physicians opined that she could perform medium work."  (J. Stip. at 22.)  Plaintiff claims that is post hoc rationalization

35

1   (id. at 23), but the ALJ himself stated that he was giving the

2   medium-work opinions "partial weight" because they were

3   "inconsistent with the record" (AR 24) and was limiting her RFC

4   because of the "combined effects" of her impairments (AR 22).

5   Indeed, when he listed her severe impairments, which included

6   physical and mental ones, he specifically noted that they

7   "combine[d] to cause more than a minimal limitation on the

8   claimant's ability to perform the basic work activities on a

9   regular and continuous basis."  (AR 18.)

10      Because the record shows that the ALJ properly considered

11  Plaintiff's impairments in combination, remand is not warranted.

12      E.   The ALJ Properly Found at Step Five that Plaintiff

13           Could Do Alternative Work

14      Plaintiff argues that the Commissioner did not meet her

15  burden at step five of demonstrating that she could do the work

16  specified by the VE.  (J. Stip. at 23-25.)  But as discussed

17  below, the ALJ properly found that she could do the small-

18  products-assembler work, and remand is not necessary.

19           1.   Applicable law

20      At step five, the Commissioner has the burden of showing the

21  existence of work in the national economy that the claimant can

22  perform, taking into account her age, education, and vocational

23  background.  See Pinto v. Massanari, 249 F.3d 840, 844 (9th Cir.

24  2001).  To meet this burden, the ALJ must "identify specific jobs

25  existing in substantial numbers in the national economy that

26  claimant can perform despite her identified limitations."

27  Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995).

28      When a VE provides evidence at step five about the

36

requirements of a job, the ALJ has an affirmative responsibility to ask about "any possible conflict" between that evidence and the DOT. See SSR 00-4p, 2000 WL 1898704, at *4 (Dec. 4, 2000); Massachi v. Astrue, 486 F.3d 1149, 1152-54 (9th Cir. 2007) (holding that application of SSR 00-4p is mandatory). When such a conflict exists, the ALJ may accept VE testimony only if the record contains "persuasive evidence to support the deviation." Pinto, 249 F.3d at 846 (citing Johnson, 60 F.3d at 1435); see also Tommasetti, 533 F.3d at 1042 (finding error when "ALJ did not identify what aspect of the VE's experience warranted deviation from the DOT").

An ALJ also has a responsibility to resolve "obvious or apparent" conflicts between a VE's testimony and the DOT. Gutierrez v. Colvin, 844 F.3d 804, 808 (9th Cir. 2016). A conflict is "obvious or apparent" when it is at odds with DOT job requirements related to tasks that are "essential, integral, or expected parts of a job." Id. "[W]here the frequency or necessity of a task is unlikely and unforeseeable," the ALJ need not "follow up with more specific questions." Id.

## 2. Relevant background

At the start of the VE's testimony, the ALJ asked her to "let us know the difference" if she "g[a]ve an opinion which is different from the DOT," and she said she would. (AR 62.) The ALJ then asked her to assume an individual of Plaintiff's age, education, and work background who was limited to "light" work; "occasional kneeling, jumping and walking on uneven terrain"; "simple repetitive tasks"; "no more than occasional contact with coworkers and no contact with the general public." (AR 63-64.)

37

The individual also had to avoid "even moderate exposure to fume, odors, dust, gases and poor ventilation" and "concentrated exposure to extreme cold, extreme heat, wetness and humidity." (AR 63.)[39]

The VE testified that such a person could be an assembler of small products, DOT 706.684-022, 1991 WL 679050 (Jan. 1, 2016). (AR 63; see also AR 64.) Plaintiff's attorney questioned whether "the interaction with coworkers and the public[] would . . . eliminate a lot of the jobs," and the VE confirmed that it would but that work as a "table worker [or] bench hand assembler" would still be doable. (AR 66.)

3. Analysis

Plaintiff argues that the ALJ erred at step five because the "assembler of small parts" job "is generally performed on an assembly line" and her RFC requires "limited contact with her co-workers and no contact with the public." (J. Stip. at 23-24.) She claims that the job lacks "a logical bridge" with her RFC. (Id. at 24.) Plaintiff also implies that the work does not meet the limitations necessitated by her COPD. (Id. at 23-24.)

The DOT listing for assembler of small products makes clear that the environmental conditions Plaintiff complains would affect her COPD "do[] not exist." DOT 706.684-022, 1991 WL 679050 (Jan. 1, 2016) (listing extreme cold or heat, "wet and/or humid," "toxic caustic chemicals," and other environmental conditions as "[n]ot [p]resent").

---

[39] The ALJ presented the VE with a few different hypotheticals, but the RFC he determined included the limitations in hypotheticals two and three, which are the ones noted.

And the listing rates working with people (including
"[t]aking [i]nstructions" and "[h]elping") as "[n]ot
[s]ignificant" and "[t]alking" as "[n]ot [p]resent." Id. The
description states that such a worker "[f]requently works at
bench as member of assembly group assembling one or two specific
parts and passing unit to another worker." Id. Plaintiff argues
that this type of interaction with coworkers goes beyond her RFC
(J. Stip. at 24, 25-26), but as Defendant points out, she "does
not provide evidence that working on an assembly line involves
more than occasional interaction with co-workers," only
"layperson conjecture" (id. at 25). Moreover, Dr. Funkenstein,
whose opinion the ALJ gave "good" weight (AR 24), specifically
found that although Plaintiff was "[m]oderately limited" in her
ability to "get along with coworkers" (AR 82), she was "[n]ot
significantly limited" in "work[ing] in coordination with or in
proximity to others without being distracted by them" (AR 81).
Indeed, Plaintiff's attorney asked the VE about the compatibility
of assembly work and limited contact with coworkers, and the VE
appears to have confirmed that the jobs she identified were
appropriate. (AR 66.)

No "obvious or apparent" conflict therefore existed between
the DOT and the VE's testimony. Gutierrez, 844 F.3d at 808; cf.
Bayliss, 427 F.3d at 1218 ("A VE's recognized expertise provides
the necessary foundation for his or her testimony.");
§ 416.960(b)(2) ("vocational expert . . . may offer expert
opinion testimony in response to a hypothetical question"); SSR
00-4p, 2000 WL 1898704, at *2 (Dec. 4, 2000) (SSA relies
"primarily on the DOT" at step five and may use VE "to resolve

complex vocational issues").

Thus, the ALJ properly found that Plaintiff could do alternative work and was not disabled.  (AR 25-26.)

**VI.   CONCLUSION**

Consistent with the foregoing and under sentence four of 42 U.S.C. § 405(g),[40] IT IS ORDERED that judgment be entered AFFIRMING the Commissioner's decision, DENYING Plaintiff's request for payment of benefits or remand, and DISMISSING this action with prejudice.


DATED: February 14, 2019

JEAN ROSENBLUTH
U.S. MAGISTRATE JUDGE

---

[40] That sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."

40